1   ANDREW ROZYNSKI, ESQ.
    (seeking *pro hac vice*)
2   EISENBERG & BAUM, LLP
    24 Union Square East, Penthouse
3   New York, NY 10003
    Tel: (212) 353-8700
4   Fax: (917) 591-2875
5   E-mail: ARozynski@eandblaw.com

6   and

7   MARTIN L. WELSH, ESQ.
    Nevada Bar No. 008720
8   LAW OFFICE OF HAYES & WELSH
    199 North Arroyo Grande Blvd., Suite 200
9   Henderson, Nevada 89074
    Telephone: (702) 434-3444
10  Facsimile:  (702) 434-3739
    E-mail: mwelsh@lvlaw.com;
11          k.bratton@hayesandwelsh.onmicrosoft.com

12  *Attorneys for Plaintiffs*

13              **IN THE UNITED STATES DISTRICT COURT**
                      **DISTRICT OF NEVADA**
14

15  ELENA JULL and DERRICK JULL,          Case No.

16              Plaintiffs,

17      v.                                **COMPLAINT**

18

19  UNIVERSAL HEALTH SERVICES, INC.;
    VALLEY HEALTH SYSTEM LLC;
20  CENTENNIAL HILLS HOSPITAL
    MEDICAL CENTER; and SUMMERLIN
21  HOSPITAL MEDICAL CENTER,

22              Defendants.

23

24          Plaintiffs Elena Jull and Derrick Jull, by and through their undersigned counsel,

25  Eisenberg & Baum, LLP, and Law Office of Hayes & Welsh, as and for their Complaint

26  against the above-listed Defendants, hereby allege as follows based upon personal knowledge

27  and information and belief:

28  / / /

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

## INTRODUCTION

1.      Plaintiffs are a deaf married couple whose primary and preferred means of communication is American Sign Language ("ASL"). As such, Plaintiffs require an ASL interpreter to effectively communicate and participate in a medical setting.

2.      Effective communication between medical providers and patients provides better patient safety, better treatment adherence, and better health care outcomes. Indeed, "it is primarily through language that the physician works to establish rapport and trust. Good physician-patient communication is fundamental to good health care." E. McEwen & H. Anton-Culver, Journal of Family Practice, Vol. 26, No. 3:289–291, 291 (1988).

3.      Over the course of several months between November 2020 and March 2021, Plaintiff Elena Jull visited the Defendants' hospitals for severe health issues including sepsis, chest pain, shortness of breath, racing heartbeat, hematuria, hypoglycemia, diabetes, and pneumonia, and a suspected COVID-19 infection.

4.      During this time, Defendants discriminated against Plaintiffs by failing and/or refusing to provide auxiliary aids and services necessary to facilitate and ensure effective communication with Plaintiffs, preventing Plaintiffs from enjoying the same services that are provided to hearing individuals.

5.      Specifically, Defendants failed to accommodate Plaintiffs by repeatedly denying Plaintiffs' requests for qualified in-person ASL interpreters for Mrs. Jull's care, and only occasionally providing video remote interpreting ("VRI") equipment that often either malfunctioned, failed to display an interpreter, or was otherwise not a viable means of communication between Plaintiffs and Defendants' staff given the complexity of Mrs. Jull's health issues, the inconsistency in Defendants' provision of VRI services, and the length of her treatment.[1] Instead, Defendants mostly resorted to note-writing to communicate with Plaintiffs.

---

[1]      VRI is "an interpreting service that [should] use[] video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images."  28 C.F.R. § 36.104.

2

LAW OFFICE OF
**HAYES & WELSH**
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

At other times, Mr. Jull and Plaintiffs' children had to act as ad-hoc interpreters for Mrs. Jull, and Plaintiffs often could not understand what was being communicated throughout Mrs. Jull's care.

6.      Accordingly, Defendants discriminated against Plaintiffs by refusing to provide reasonable accommodations they required to understand and participate in Mrs. Jull's treatment, depriving Plaintiffs of equally effective communication and equal participation during Mrs. Jull's stays at Defendants' hospitals.

7.      Without equally effective communication, Plaintiffs could not make informed choices with respect to Mrs. Jull's health care. Instead, Mrs. Jull endured protracted humiliation because of Defendants' failure to accommodate her deafness. Defendants' actions caused her greater levels of fear, anxiety, indignity, frustration, humiliation, and emotional distress than a hearing person would be expected to experience because Mrs. Jull was afraid of misunderstanding her treatment options. This was especially the case given the severity of Mrs. Jull's health issues.

8.      Based on Plaintiffs' experiences, it is evident that Defendants have failed to implement proper policies, procedures, trainings, and practices respecting the civil rights and communication needs of deaf individuals. Plaintiffs bring this lawsuit to compel Defendants to cease their unlawful discriminatory practices, and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity for deaf individuals to participate in and benefit from Defendants' health care services.

9.      Plaintiffs seek declaratory and equitable relief, monetary damages, nominal damages, and attorneys' fees to redress Defendants' unlawful disability discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116.

**THE PARTIES**

10.      Plaintiffs Derrick and Elena Jull are married individuals who reside in Las Vegas, Nevada, and are substantially limited in the major life activities of hearing and

speaking. As such, Plaintiffs are qualified persons with a disability within the meaning of federal civil rights statutes.

11.    Upon information and belief, Defendant Universal Health Services, Inc. ("UHS") is a corporation doing business in Nevada with a designated address for service at c/o Corporation Service Company, 701 S. Carson St. Ste. 200, Carson City, Nevada 89701, attn.: Matthew Taylor. Upon information and belief, UHS is a parent company of defendant Valley Health System LLC, which is itself a parent company of defendants Centennial Hills Hospital Medical Center and Summerlin Hospital Medical Center.

12.    Defendant Valley Health System LLC ("VHS") is a foreign limited liability company doing business within the State of Nevada with a designated address for service at c/o Corporation Service Company, 112 N. Curry St., Carson City, Nevada 89703, attn.: George Massih. Upon information and belief, VHS is a parent company of defendants Centennial Hills Hospital Medical Center and Summerlin Hospital Medical Center.

13.    Upon information and belief, defendant Centennial Hills Hospital Medical Center ("CHH") is a for-profit corporation doing business within the State of Nevada at 6900 North Durango Drive, Las Vegas, Nevada 89149.

14.    Upon information and belief, defendant Summerlin Hospital Medical Center ("Summerlin") is a foreign limited liability company doing business within the State of Nevada at 657 N. Town Center Drive, Las Vegas, Nevada 89144.

15.    Upon information and belief, all Defendants are places of public accommodation under federal antidiscrimination laws and receive federal financial assistance, including Medicare and Medicaid reimbursements.

## JURISDICTION & VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiffs' claims arising under the laws of the United States.

///

///

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVB., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District and the acts and omissions that give rise to the claims occurred within this District.

**STATEMENT OF FACTS**

18.     Plaintiffs are a married couple who are profoundly deaf and communicate primarily in American Sign Language. English is a secondary language for Plaintiffs. As such, they require an ASL interpreter to communicate effectively in a medical setting.

19.     Over the course of roughly four months, Plaintiffs made numerous and lengthy visits to Summerlin and CHH because Mrs. Jull was suffering from serious health issues. At both hospitals, Plaintiffs were never provided with a qualified in-person ASL interpreter, and were only occasionally provided VRI that Plaintiffs found to be an ineffective means of communication. At all other times, staff attempted to communicate with Plaintiffs through a combination of note-writing, gesturing, lip-reading, and utilizing Plaintiffs' children to interpret for them via Facetime.

20.     Plaintiffs' visits to Defendants' hospitals produced hundreds of pages of handwritten notes between Plaintiffs and Defendants' staff and doctors that demonstrate (1) Plaintiffs' inability to effectively communicate with medical staff in written English, (2) the ineffectiveness of handwritten notes to communicate medical information, generally, (3) Plaintiffs' confusion with respect to Mrs. Jull's treatment and medications, and (4) Defendants' refusal to provide Plaintiffs with in-person interpretive services or even VRI that functioned properly.

21.     Below is just one example of those handwritten notes:

/ / /

/ / /

/ / /

/ / /

/ / /

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

**November 2020**

22.     On November 14, 2020, Plaintiffs visited Summerlin after Mrs. Jull began experiencing severe coughing and back pain. She was treated and discharged that same day after being diagnosed with leukocytosis, pneumonia, and a suspected COVID-19 infection.

23.     Mrs. Jull requested an interpreter from the intake nurse at check-in, but was told by a "Dr. Deirdre" that there was none available after waiting for 30 minutes. As such, Plaintiffs were not provided with any interpretive services, including VRI, during this encounter.

24.     On November 26, 2020, Mrs. Jull was admitted to Summerlin again after experiencing additional symptoms of pneumonia. This time, she remained at Summerlin for three days and was diagnosed with acute sepsis, fever, leukocytosis, pneumonia, shortness of breath, and wheezing before being discharged on November 29, 2020. Mrs. Jull's discharge instructions noted that she is "deaf and mute," but for some reason also stated that she "communicate[s] thru writing." Plaintiffs were not provided any interpretive services despite meeting with at least five different doctors over three days, and Mrs. Jull spent the entirety of her visit severely ill and unable to communicate with anyone other than her husband except through writing notes.

**December 2020**

25.     On December 1, 2020, Plaintiffs visited the Summerlin emergency room after Mrs. Jull had an apparent allergic reaction to one of her medications. She was not provided any interpretive services for this encounter.

26.     On December 2, 2020, Plaintiffs again visited the Summerlin emergency room for symptoms which led to Mrs. Jull being diagnosed with dark stools, hyponatremia, and pneumonia. After making their usual request for a qualified in-person ASL interpreter, Plaintiffs met with a Summerlin staff member named Melissa M around 11:15am, who responded by writing "I have no interpreter currently, we can care for her but I have zero beds available." Mr. Jull reminded Melissa that Summerlin was obligated by law to provide Mrs.

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

Jull an ASL interpreter. Plaintiffs were provided VRI in the evening, and only to communicate with a nurse, not with Summerlin doctors. This was the only time that Plaintiffs were provided any interpretive aids or services until late January 2021. Plaintiffs did not remain at Summerlin for the night.

27.     Just two days later, on December 4, 2020, Mrs. Jull was admitted to CHH after experiencing hematuria and weakness. She was discharged on December 13, 2020, after being diagnosed with hyperglycemia, hypokalemia, pneumonia, severe sepsis, and shortness of breath.

28.     During Mrs. Jull's stay at CHH, Plaintiffs received no interpretive services when speaking with doctors, including a "Dr. Breeden" and "Dr. Singh." Instead, for the entire week, CHH doctors relied on a combination of note-writing and using Plaintiffs' children to interpret for them via Facetime.

29.     Plaintiffs' son and daughter, Napoleon and Summer Jull, took turns speaking with CCH doctors over FaceTime, attempting to translate what the doctors were saying to Mrs. Jull. This caused Plaintiffs and their children to feel anxious and fearful for Mrs. Jull's health and treatment. Plaintiff's children are not certified interpreters, and do not feel that they are sufficiently fluent in sign language to convey complex medical information. Regardless, the doctors repeatedly used medical terminology that Plaintiff's children were unable to convey to Mrs. Jull in ASL.

30.     In the morning of December 21, 2020, Plaintiffs visited to CHH's emergency room after Mrs. Jull developed a rash, possibly due to an allergic reaction to her medications. Although Plaintiffs remained at the emergency room for a few hours, they were never provided any interpretive services for this encounter. Instead, Plaintiffs wrote notes back and forth with infectious disease specialist Dr. Gary Skankey.

31.     Later that same day, Plaintiffs visited the Summerlin emergency room after Mrs. Jull began experiencing heart palpitations. Although Plaintiffs remained at the emergency

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

room for a few hours, they were not provided any interpretive services for this encounter, either.

32.     Instead, as usual, Summerlin doctors used note-writing to communicate with Plaintiffs during both December 21 visits. For example, one doctor wrote the following handwritten response to Mrs. Jull's simple question of whether she had hay fever, as she believed she was told by Summerlin staff at her latest visit: "I looked on the computer and didn't see the test results. I must have missed them on the computer somehow. Technically, what you have is called chronic pulmonary coccidioidomycosis (CPC) [...] It is caused by the same fungus that causes valley fever. They are just 2 different manifestations of the same disease. CPC takes a long time to treat. I keep my patients on Fluconazole for a year or two, all the while monitoring blood tests and x-rays. So, you do have a fungal infection of the lungs."

33.     Given that English is a secondary language for Plaintiffs, the use of note-writing in English and Plaintiffs' children over Facetime to communicate complex medical information prevented Plaintiffs from effectively communicating with hospital staff and actively understanding and participating in Mrs. Jull's medical care. "To deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language. *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017).

**January 2021**

34.     From January 7 to January 13, 2021, Plaintiffs visited Summerlin after Mrs. Jull experienced shortness of breath, coughing, and increased heart rate, and her primary care physician referred her for an examination. Summerlin provided VRI for Mrs. Jull's initial visit to the ER on January 7, but provided no other interpretive or auxiliary aid for the remainder of Mrs. Jull's six-day stay.

35.     Despite repeated requests, at no point did Summerlin provide Plaintiff's with an in-person interpreter. Mrs. Jull even made a written request on January 9, which was ignored.

/ / /

36.     On January 10, Mrs. Jull met with Dr. Emad Soumi and Dr. Sapna Bhatia without any interpretive services.

37.     On January 11, Mrs. Jull met with Dr. Ion Alexie without any interpretive services.

38.     On January 12, Mrs. Jull met with Dr. Soumi again, who relied on Plaintiffs' son Napoleon to interpret via Facetime, rather than utilizing VRI or any other interpreter services.

39.     On January 13, Derrick Jull placed a call from his home to Summerlin by video relay service and spoke with a supervisor named "Jennifer" about the lack of interpretive services provided to Plaintiffs.

40.     After a bronchoscopy was performed on January 13, Mrs. Jull was diagnosed with fungal pneumonia, sepsis, and shortness of breath, and was discharged from Summerlin. Plaintiffs never received any auxiliary aid or interpretive services during this stay other than the initial provision of VRI on January 7.

**February and March 2021**

41.     On January 25, 2021, Mrs. Jull returned to Summerlin emergency room suffering from hypoglycemia, and remained at Summerlin until January 29. Plaintiffs were not provided with any interpretive services during either of these days, and Plaintiff's daughter Summer was forced to interpret for them.

42.     On January 31, Mrs. Jull was admitted to Summerlin hospital where she remained until March 1, 2021. This time, Mrs. Jull was eventually diagnosed with valley fever, a fungal infection. Plaintiffs were never provided with qualified in-person ASL interpreters during Mrs. Jull's month long stay. VRI was provided to Plaintiffs on a limited basis from February 1 through February 6, and very sparingly over the remainder of Mrs. Jull's stay. Plaintiffs' son Napoleon again had to translate for Plaintiffs via Facetime on occasion.

///

///

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

43.     Plaintiffs specifically recall not having any interpretive services, including VRI, for any of Mrs. Jull's interactions with Summerlin doctors on February 7, 8, 9, 11, 16, 20, 22, and 26.

44.     Indeed, during a video call to Mrs. Jull on February 22, Plaintiff's daughter could hear nurses speaking in English to Ms. Jull, despite that she cannot hear.

45.     That same day, Mrs. Jull expressed to her daughter that she preferred to use an in-person interpreter or at least VRI rather than her daughter because of the complex medical terminology being discussed with Mrs. Jull. However, Summerlin's VRI system was not working and Summerlin did not provide an in-person interpreter. When Plaintiffs' daughter attempted to convey her mother's request to the doctor, the doctor expressed frustration with the request and responded "Why?"

46.     Instead, those doctors used extensive note-writing to attempt to communicate complex medical information to Plaintiffs, including to respond to Plaintiff's concerns for her own life. For example, on February 16, 2021, Plaintiff exchanged the following communication with Dr. Alexie:

DR. ALEXIE: How do you feel?

MRS. JULL:  I feel ok [.]

DR. ALEXIE: The CT is worse but it may take a while to get better with the new treatment [.]

MRS. JULL:  Worse? Like what?

DR. ALEXIE: Looks like the infection got worse on CT. We need to continue the current treatment [...] No other infection just the Valley Fever [.]

MRS. JULL:  Will I die if it get[s] worse? Dr. said I stay until 22nd?

DR. ALEXIE: I don't think so [...] Your oxygenation is good [;] you look and feel good [;] will just have to continue the treatment [.]

/ / /

47.     Mrs. Jull made her concerns regarding the lack of interpreters clear to Summerlin supervisors. For example, on February 20, Plaintiffs discussed their communication issues with a supervisor who, upon information and belief, has the last name "Hidalgo." On February 22, Plaintiffs wrote similar complaints to another supervisor who, upon information and belief, is named "Julie," after meeting with doctors over the past few days without any interpretive services.

48.     Plaintiffs repeated their written requests to Summerlin staff for interpreters throughout the entire month of February. For example, Plaintiff's at one point wrote "can we get [an] interpreter?," and "that's why I ask for [an] interpreter so [I] can communicate clearly." After it became clear that Plaintiffs would not be provided an in-person interpreter during Mrs. Jull's stay, Plaintiffs wrote to another staff member to ask "Hi - can we talk with an interpreter using Globo [VRI] tablet? [T]he nurse has [the] tablet." At another point, Mrs. Jull wrote "can we get [an] interpreter? [The] nurse has [tablet . . .] she turned off." On yet another occasion, a nurse responded to Mrs. Jull's request for VRI by asking, "VRI? What is that?"

49.     Even when Mrs. Jull was provided VRI, communication with Summerlin staff and doctors was exceedingly difficult. Mrs. Jull repeatedly notified Summerlin staff of her issues with the VRI. At one point, Mrs. Jull wrote to Summerlin staff that "every time I try to call I can't talk or hear," "I don't think she understand[s] what I said. Sometime[s] she misunderstand[s]," and "how can we change interpreter!?!" At another point, Mrs. Jull wrote "not good interpreter [...] hard to understand me [...] I had to say repea[te]dly [...] so frustrated some certified interpreters not good. Sometime I ask them to leave." None of these notes received a direct response from Summerlin staff. Mrs. Jull also expressed her frustration after a VRI call that "she said she's not a good interpreter[.] I request[ed] another interpreter. She said [an]other interpreter isn't available."

50.     As set forth above, Plaintiffs did not have any interpretive aid for much of Mrs. Jull's month-long stay at Summerlin. Even when VRI was used, Plaintiff often had to convince

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

staff that it was necessary. For example, Plaintiff wrote a note to Summerlin staff, asking "please get VRI," to which staff responded, "I don't have any news [...] Do you have any new questions?" Plaintiffs then attempted to write out four separate questions regarding Mrs. Jull's medical treatment, including "1) Discuss about Meds"; "2) how many Days to use Antibiotics Meds?"; "3) how long will Elena have to use Oxygen?"; and "4) Does Elena have fungal in Lung for real?" Rather than procure an interpreter, or even VRI, to answer these medical questions as a medical professional would for a hearing patient, the staff member responded by half-heartedly answering, "We did yesterday," "7 more days," "I don't know," and "Yes."

51. Mrs. Jull was discharged on March 1, 2021.

**Facts relevant to all dates and Defendants**

52. Plaintiffs were not provided an in-person interpreter during any of Mrs. Jull's stays at Summerlin or CHH between November 2020 and March 2021.

53. Upon information and belief, Defendants and their employees follow the recommendations and regulations of the Joint Commission.

54. Upon information and belief, Defendants and their employees follow the recommendations for effective communication in the Joint Commission's Advancing Effective Communication, Cultural Competence, and Patient- and Family-Centered Care: A Roadmap for Hospitals, https://bit.ly/3usVEEh ("A Roadmap for Hospitals").

55. Consistent with the Joint Commission's guidance, Defendants have a responsibility to "develop a system to provide language services to address the communication needs of patients whose preferred language is not English, including patients who communicate through sign language." A Roadmap for Hospitals at page 40, https://bit.ly/3usVEEh.

56. Defendants have a responsibility to identify a "patient's preferred language for discussing health care." A Roadmap for Hospitals at page 10, https://bit.ly/3usVEEh.

57. If necessary to determine a patient's preferred language, Defendants should "[a]rrange for language services to help identify the patient's preferred language," and once the

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444 FAX (702) 434-3739

preferred language is identified, Defendants should "[n]ote the patient's preferred language for health care discussions in the medical record and communicate this information to staff." A Roadmap for Hospitals at page 10, https://bit.ly/3usVEEh.

58.     The Joint Commission requires hospitals like Defendants to "[p]rovide an interpreter for the patient's preferred language during informed consent discussions, even if the hospital provides translated materials, to facilitate patient communication." A Roadmap for Hospitals at page 20, https://bit.ly/3usVEEh.

59.     As advised by the Joint Commission, Defendants are aware that "[e]xchanging written notes . . . will likely be effective communication for brief and relatively simple face-to-face conversations." A Roadmap for Hospitals at page 69, https://bit.ly/3usVEEh.

60.     Similarly, Defendants are aware that "[w]ritten forms or information sheets may provide effective communication in situations with little call for interactive communication, such as providing billing and insurance information or filling out admission forms and medical history inquiries." A Roadmap for Hospitals at page 69, https://bit.ly/3usVEEh.

61.     Defendants knew or should have known of their obligations as health care providers under federal antidiscrimination laws to develop policies to promote compliance with these statutes and to provide reasonable accommodations, including the provision of ASL interpreters to ensure effective communication with deaf individuals.

62.     Defendants and their staff knew or should have known that their actions and inactions created an unreasonable risk of causing Plaintiffs greater levels of emotional distress than a hearing person would be expected to experience.

63.     Indeed, Defendant's discrimination against Plaintiffs, and Plaintiffs' resulting lack of understanding as to Mrs. Jull's medical care, caused Plaintiffs to suffer humiliation, anger, frustration, stress, anxiety, and emotional distress.

64.     Nevertheless, Defendants prevented Plaintiffs from benefitting from their services by failing to provide the ASL interpreters necessary for them to effectively communicate and participate in a health care setting.

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVB., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

65.     In doing so, Defendants intentionally discriminated against Plaintiffs and acted with deliberate indifference to their federally protected rights.

66.     Defendants' wrongful and intentional discrimination against Plaintiffs on the basis of disability is reflected by Defendants' failure to train employees and promulgate policies of non-discrimination against deaf individuals.

67.     As a result of Defendants' failure to ensure effective communication with Plaintiffs, the Julls received services that were objectively substandard and that were inferior to those provided to patients who are hearing.

68.     Plaintiffs are entitled to equal access to services offered by Defendants as are enjoyed by non-disabled persons.

69.     Given Mrs. Jull's ongoing health concerns, Plaintiffs still wish to access Defendants' facilities, but are deterred from doing so by Defendants' discrimination against them on the basis of disability.

## CAUSES OF ACTION

### COUNT I: Violations of Section 1557 of the Patient Protection and Affordable Care Act

70.     Plaintiffs incorporate by reference all preceding paragraphs and reallege them in support of this claim.

71.     At all times relevant to this action, the ACA has been in full force and effect and has applied to Defendants' conduct.

72.     At all times relevant to this action, Plaintiffs have had substantial limitations to the major life activities of hearing and speaking and has been an individual with a disability within the meaning of the ACA, 42 U.S.C. § 18116.

73.     At all times relevant to this action, Defendants have received federal financial assistance, including Medicare and Medicaid reimbursements, and have been principally engaged in the business of providing health care.  Thus, Defendants are health programs or activities receiving federal financial assistance under 42 U.S.C. § 18116(a).

/ / /

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

74.    Under the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116.

75.    Federal regulations implementing the ACA provide that a covered entity "shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in such programs or activities, in accordance with the standards found at 28 CFR 35.160 through 35.164." 45 C.F.R. § 92.102(a).

76.    Accordingly, federal regulations implementing the ACA also provide that a "[covered] entity shall furnish appropriate auxiliary aids and services when necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a [covered] entity shall give primary consideration to the requests of individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.  28 C.F.R. § 35.160(b), *cited by* 45 C.F.R. § 92.102(a).

77.    Federal regulations implementing the ACA further require that a covered entity that provides individuals with disabilities "qualified interpreters via VRI services shall ensure that it provides–(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position; (3) A clear, audible transmission of voices; and (4) Adequate

1  training to users of the technology and other involved individuals so that they may quickly and

2  efficiently set up and operate the VRI." 28 C.F.R. § 35.160 (*cited by* 28 C.F.R. §§ 35.104 &

3  36.303(f); in turn *cited by* 45 C.F.R. § 92.102(b)(1)(i)).

4  78.    At all times relevant to this action, Plaintiffs' primary language for

5  communication has been ASL, and they have a limited ability to read, write, speak, or

6  understand English. Plaintiffs are thus also individuals with limited English proficiency within

7  the meaning of the ACA.

8  79.    Indeed, the ACA regulations governing individuals with disabilities and

9  individuals with limited English proficiency contain virtually identical definitions,

10  prohibitions, and requirements. For example, compare 45 C.F.R. § 92.102(b)(2)(i)–(iii)

11  regarding the provision of interpreters to individuals with disabilities:

12  When an entity is required to provide an interpreter . . . the

13  interpreting service shall be provided to individuals free of

14  charge and in a timely manner, via a remote interpreting service

15  or an onsite appearance, by an interpreter who

16  (i)    Adheres to generally accepted interpreter ethics
        principles, including client confidentiality; and

17

18  (ii)    Is able to interpret effectively, accurately, and
         impartially, both receptively and expressively, using any
19         necessary specialized vocabulary, terminology and
           phraseology;
20

21  with 45 C.F.R. § 92.101(b)(3)(i)(A)–(C) regarding the provision of interpreters with limited

22  English proficiency:

23  [Interpreter services] must be provided by an interpreter who:

24

25  (A)    Adheres to generally accepted interpreter ethics
        principles, including client confidentiality;

26  (B)    Has demonstrated proficiency in speaking and
        understanding at least spoken English and the spoken
27         language in need of interpretation; and

28

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

(C) Is able to interpret effectively, accurately, and impartially, both receptively and expressly, to and from such language(s) and English, using any necessary specialized vocabulary, terminology and phraseology.

80. Federal regulations implementing the ACA provide that a covered entity "shall take reasonable steps to ensure meaningful access to such programs or activities by limited English proficient individuals," 45 C.F.R. § 92.101(a), and that where an individual "requires the provision of language assistance services, such services must be provided free of charge, be accurate and timely, and protect the privacy and independence of the individual with limited English proficiency. Language assistance services may include: (i) Oral language assistance, including interpretation in non-English languages provided in-person or remotely by a qualified interpreter for an individual with limited English proficiency, and the use of qualified bilingual or multilingual staff to communicate directly with individuals with limited English proficiency; and (ii) Written translation, performed by a qualified translator, of written content in paper or electronic form into languages other than English." 45 C.F.R. § 92.101(b)(2)(i)–(iv).

81. As set forth above, Defendants discriminated against Plaintiffs on the basis of disability in violation of the ACA and its implementing regulations.

82. The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to Plaintiffs – that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act. 42 U.S.C. § 18116(a).

83. Defendants failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

84. Plaintiffs are entitled to injunctive relief, attorneys' fees, costs, and disbursements, nominal damages, and compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged under the ACA.

/ / /

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444 FAX (702) 434-3739

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray that the Court:

A.     Enter a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiffs to unlawful discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act;

B.     Issue an injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals or their companions, meaningful access to and full and equal enjoyment of Defendants' facilities, services, or programs;

C.     Issue an injunction ordering Defendants:

      i.     to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an in-person interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

      ii.     to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly marked and worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

      iii.     to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances, recognizing that the Video Remote Interpreting System is not appropriate in all medical situations;

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVB., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

iv.   to develop, implement, promulgate, and comply with a policy to ensure, in the event Defendants use a Video Remote Interpreting System that has a high-speed Internet connection; a video screen with appropriate size, position, capture angle, focus, and proximity to the deaf individual; and appropriate audio quality. When possible, the equipment should be portable and made available to the patient where the patient is located, preferably in a private room to minimize distractions and maintain confidentiality;

v.   to train all their employees, staffs, and other agents on a regular basis about how to properly use a Video Remote Interpreting System, including how to set it up and how to obtain technical assistance in case of system malfunction or failure, and how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals;

vi.   to create and maintain a list of sign language interpreters and ensure availability of such interpreters at any time of day or night;

vii.   to train all employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ACA;

D.    Award to Plaintiff:

i.   Compensatory damages;

ii.   Reasonable costs and attorney's fees;

iii.   Nominal damages;

iv.   Interest on all amounts at the highest rates and from the earliest dates allowed by law;

/ / /

/ / /

/ / /

/ / /

LAW OFFICE OF
HAYES & WELSH
A PROFESSIONAL CORPORATION
199 NORTH ARROYO GRANDE BLVD., SUITE 200
HENDERSON, NEVADA 89074
(702) 434-3444  FAX (702) 434-3739

v.   Any and all other relief that this Court finds necessary and appropriate.

Dated: July 16, 2021

Respectfully submitted,

**EISENBERG & BAUM, LLP**

Andrew Rozynski, Esq. (seeking *pro hac vice*)
24 Union Square East, Penthouse
New York, NY 10003

and

LAW OFFICE OF HAYES & WELSH
Martin L. Welsh Esq.
Nevada State Bar No. 8720
199 North Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074

*Attorneys for Plaintiffs*

21